The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Have you seen it? Our third case for the day is Baxter v. Commissioner of Internal Revenue. Mr. Autry? Yes, sir. Did I pronounce that correctly? You did. May it please the Court. On behalf of Mr. and Mrs. Baxter, we'd like to make three points above all others. One, what troubles them most is that they are being punished in 2000 based upon cases and concepts that arose in 2006 and 2009 that contradict the three controlling Supreme Court economic substance cases. It's not right. You will find no case in 2000 when their advisors were dealing with these thoughts, these Supreme Court cases that suggest that profit, reasonable possibility of profit, can be calculated without revenue. You will find no case in 2000 that segregates the cost of a debt from the revenue of the debt. Point two, the three Supreme Court cases establish that we must look at the whole undertaking, the nature of the entire transaction, all interdependent steps. To its credit, the government concedes that point at page 36 of its brief. When one considers the whole undertaking, the nature of the entire transaction, and walks through Exhibit 4J, which explains this concept, this proposal to Buffy Baxter, and she explained it to her husband who's blind, what is the object here? Does this make financial sense? We know it leads to an annual projected revenue, net profit of 9.3%, and that satisfies both prongs of this Court's economic substance test, reasonable possibility of profit objectively. Why is it that the expiration of the loan was 2030, but all of its provisions spoke to or in one-year terms? Well, actually, Your Honor, all of the terms were stated in 30-year terms. Even the internal data was stated in 20-year terms. If you drill down into these – You misspoke. Excuse me? You just said 20 years. I misspoke. 30 years. Forgive me. Thank you. Even the internal bank document said 30-year terms. If you drill down, and we had an expert, Mr. Walker, who was the only competent commercial lending expert. He says this is a standard 30-year term institutional loan. There are one-year resets on the interest rates, as you would expect. It's an adjustable rate. This is a custom adjustable rate debt structure. So there's got to be one-year resets on the interest rates and on the foreign currency exchanges because the loans are by German bank and stated in terms of euros. So those things change every year, and they have to be adjusted every year. So thank you. In our reply brief, we tried to document all the instances that it's 30 years, 30 years, 30 years. This 4J from Mrs. Baxter's perspective, the PowerPoint that explains it to her abundantly clear,  there's an Excel spreadsheet, a detailed Excel spreadsheet that was revised again and again. All of that on a 30-year basis, and it is the source of the two most important percentages in this case. Didn't everything have a one-year call in the middle? No, the one-year reset. No, sir. There is a one-year reset on the interest rate. Now, they're not obligated. It's like every other large institution. The bank can walk away at any point, but it can certainly walk away at the one year. There's a one-year reset on interest, and if they don't give you an acceptable interest rate, then either party can walk away. There's a one-year reset on the foreign currency, and if that's not done, then it's not done. But I don't practice institutional banking. Our institutional banking expert says this is standard institutional adjustable rate banking terms to have these internal terms. We saw through the recession that banks have the ability to walk away, but they rarely walk away prior to the recession if the debtor is servicing the debt as promised. You have a letter of credit. Yes, sir. The futures, the contract books change. Right? No, the letter of credit was indefinite. The time of deposit was for one year. No, sir. There's a rolling interest rates on the – it's a complex structured debt. They set aside 85% of the debt balance in an income earning deposits, and those are adjusted on an annual rate. And so, yes, they're adjusted on an annual rate, but they're not one-year terms. The one-year terms are the reset on the interest and the foreign currency. So this lending agreement was the one that had the one-year call on it? Yeah. We're told by the expert every one of these things have one-year call, every year, every year. So it's not just the first year. It's every year. So the generalities that you started out with, you know, seem to all flow, but when you get out into the meat of what this transaction was about, how it was set up, then you begin to get into this whole question of does this satisfy economic substance. Certainly. And when you look at what actually happened here, the way in which clearly it was for, even though I take it your client may have testified she wasn't thinking about taxes. Well, she did. She was thinking about taxes. Right. So it is very clear that taxes were, and nothing wrong with trying to avoid taxes. That's done all over the place. But the manner in which this was done, and the question is, was it an investment? The challenging thing, I think, is looking back on this by way of hindsight, because we now know it blew up in the fall of 2001. In 2000, when it was being presented, the specific testimony from the CPA, I asked him, are you sure you're, I asked the bank, are you sure, HEV, you're in this for 30 years? We're sure. We're good. All right. So they get into 2001, and it blows up, and you look back on it and say, well, that must have been what was intended all along. You were involved in it back then? No, sir. I was only involved in the defense. And so, but I handled the trial. And so. Most of those involved in it back then wouldn't be able to argue this case right now. That's what I was wondering. I thought he said he was involved in it back then. But you handled the trial in your tax court. I tried it in the tax court, and we called the lawyers who were involved and the CPA firm, the CPA firm paid. I just misunderstood you. I was speaking in the first person. Forgive me. Our people. It was tried in the tax court by a single judge. It wasn't any panel. It was. That's correct. This is a decision of the single judge, presiding judge. Yes, sir. After a trial, right? That's correct. Trial to the court. He could make findings of fact if he wanted to. Certainly. And he's happened to be the chief judge, right? Yes. Of the tax court. Yes. How many judges on the tax court? It fluctuates 18 to 20. Okay. You drew the chief, or this one was so big that the chief took it? How did that work? I don't believe that she was the chief. Chief. I'm sorry. Her term came on as chief. I thought it said on the order that she was the chief. She certainly was at the time of the trial. L. Paige Marble, chief judge. Yes, sir. September 6, 2007. Certainly. And we had several years, but she became the chief along the way, and I can't tell you when that was. When she tried it, she wasn't the chief. When she disposed of it, she was the chief. That's correct. There you go. And so that does raise an interesting point. This memorandum opinion, there is a regular tax court opinion. Tax court's got two types of opinions, regular precedential opinions, tax court opinions, and memorandum opinions. C&T is a regular tax court opinion, which says when you're dealing with this sort of situation of someone's reliance upon long-time trusted advisors, there's a three-prong test. That three-prong test never was applied to any one of the three individuals, the long-time trusted advisors there. Are they competent? No real dispute about that. Will they provide all the information? They had greater access information and did. The Curtis family, this is Buffy Curtis Baxter. Her maiden name is Curtis. Her family, the Curtis family, genuinely relied upon these people for many years for many different things. And so one of our challenges on the penalty aspect is that that test was never applied. If it had been applied under this tax court precedential opinion as opposed to memorandum opinion, the result would be non-precedential? It's generally non-precedential. We have them here. We call them published and unpublished. Is that what you're talking about? It used to be completely non-precedential. Now you see them cited sometimes. And so that has changed over the life course of my career. But it's the decision in this case. It is the decision. It's just like a jury verdict. Certainly. If you had a trial to the court and a federal district court, it would be the same thing, right? Certainly. But the precedential point, I think, is of some significance to our view of the world. And so the third point I wanted to share with you, and then I'd like to loop back into our focus on the reasonable cause and why there should be no penalties. They also touch upon the substantive. Thank you, Dr. King. I'm sorry. Go ahead. Thank you. When you're talking about reliance on trusted advisors, I take it you're talking about Brown and Wood? No. No? Okay. I was having trouble understanding your reference. You didn't name the artist. I'd be happy to. Brown and Wood was a New York, a large. I know who Brown and Wood was. I wanted to know who you were talking about relying on. Yes. Our people most relied upon the two CPAs, Barbara Coates and Matthew Atwin and Brandon, and Tom Rogers, their longtime business tax lawyer. And so they relied upon those folks to independently look at whether or not they were being told it was correct. There is an error, a clearly erroneous error that I think cures up this whole reasonable cause concept, and now that in response to your question, Judge Dungeon, I think it triggers that point. You may recall that the tax court opinion said you can't rely upon your longtime trusted advisors, those three individuals, local advisors, because they did nothing more than just look at the Brown and Wood opinion. They testified completely different from that, but she said they looked at nothing more and there was no independent analysis. You may also recall in the opinion where the court says, I know that the CPAs say that they provided independent advice that this was a spreading of the tax, this was not an avoidance of tax. I dismiss that as not credible because there's no supporting documentary evidence. So this argument is going to the accuracy-related penalties? Yes, I'm still on that. I've gone back to the penalties. Forgive me. I was going to get to the third point, but not yet. But this is our most critical point, I think, on the penalties, because correction of one error cures another error. We know that that is not true when they say that these CPAs didn't give independent advice because there's no documentary evidence. We know that because of Exhibit 66P, the contemporaneous notes where they gave completely independent advice that was not covered by Brown and Wood saying, look, this thing doesn't work the way that you've been told, we're looking at this, we're separately researching this, and this is our conclusion. That cure of that shows that they were providing independent advice and that the court was mistaken when it said they were doing nothing more than looking at this opinion and saying it's okay. Was there a conflict of interest? There was never an assertion as to a conflict of interest as to Brown and Wood. None of our advisors thought Brown and Wood had an opinion. There was never, ever any suggestion of conflict of interest on the part of the three local advisors. Now, you think about it. I'm told there's this big New York law firm that's looked at this, but I've had no prior relationship. What's the best thing I can do? But then I don't know about their devotion to me. I'm going to get people who are absolutely devoted to me to look over their shoulder, even though the Supreme Court says in Boyle, I need not seek a second opinion. Excuse me, you had a question? But I don't want to. Please. One of the things that bothered the tax court, and it does seem questionable as a warning flag about these transactions, were the fees. So you paid Chenery $154,000 in fees, and CIC paid $1 million, well, essentially $2 million in fees. And the reason that that arguably legitimately concerned the tax court is, even if you compared the transaction to any other transaction, you would not have had the drag on the investment that those extremely significant fees would have. But there had to be investment options that would have been more profitable given the drag created by the fees. That is the heart of the challenge. Certainly the Curtis's had difficulties with those fees. If they could have gotten them lower, they would have. But they're looking at the fees on, in the instance of CIC, a 35-million-euro loan. And at 8%, the fees should have been a little bit higher, a little bit higher. But the court said, but we're going to disregard the fact that the family investment company is doing a $35 million loan. We're going to assume that it's only 15% of that amount. And I'll need to talk about that 15% in a minute. But there is a stipulation, Stipulation 51 directly on point, saying they're completely fully recourse liability for the full 35. And in the same way, Buffy and Rick Baxter are liable for a 2.9. What is the biggest missed point in the entire case is a structured transaction that's being presented as a zero coupon, meaning interest-free. And the way that's handled is 85% of the proceeds are set up in income earning capacity that covers all the interest costs, so you get interest-free use of money for 30 years. The exponential growth of that is what generates the two most important percentages in the case, the 7.9% hurdle rate for full payment of the interest and all of these fees, heavy though they may be, and all the principal. 7.9% return to make a profit, rendering a 9.3% profit. Do you know what that red light means? I just ran over it. You've got a case in the 11th Circuit, too. I do. Is there any material distinction between the issues in these two cases? Yes. You've argued it in the 11th Circuit. We argued it a month ago. It's pending. And it is submitted, Your Honor. Pending. Excuse me? It's pending. It's pending? Yes, sir. Submitted to the court. Oral argument has been completed. Please forgive me for overrunning. Thank you. Thank you. Ms. Rubin? Good to have you here, Ms. Rubin. Thank you so much, Your Honor. May it please the Court, I represent the Commissioner of Internal Revenue in this case. As in every other case to address the cards transaction, Lonnie Baxter's cards transaction here lacks economic substance. Most of the findings here are subject to clear error. And really there's been no showing and very little showing of any actual clear error in any factual findings. There's only been two facts. I was analyzing the economic substance that was reported to look at it from the two prongs, whether it was the subjective and objective prongs of that. That's right. And I did not quite follow the argument before that sort of went around that. But it seems to me you first have to kind of look at those prongs there and then analyze it from the perspective that the tax court did in order to be able to determine if it was clear error. I agree, though. I do think that the lack of showing of errors in the fact finding and the credibility findings is relevant to the overall undertaking here. When you're looking at all of what the court's analysis was, you're really finding that it's grounded on credibility calls. She just didn't believe these people about a lot of things. Now let's start first with the objective prong, as you say. And one critical thing here is that she found based on four critical parts of this transaction, she didn't believe that the parties actually believed it was going to be a 30-year transaction. And the first is that that time deposit was set for only one year. That's JA 548 paragraph 167 and JA 1409 to 19. So that's that 85% pool they're talking about. That's going to be the first thing that any money that's being paid out of is going to be paid out of, and it was only set for one year. The second thing is that the letter of credit from CIBC that was used to get these funds, that was necessary to substitute in so that was a more than 100% collateralized loan here, that was only one year and the agreement didn't include anything saying it could be extended or renewed. That is going to be JA 143 section 1.1. The third thing is that, yes, this agreement had every year HVB could reset the interest or pull the loan, which is what they did after one year here as happened in all the other CARS cases, including ones that had nothing to do with 9-11, which is one of their big points was, oh, this was pulled because of 9-11. And that's going to be JA 553 paragraph 171 and JA 1337. And then here's the real kicker. Lonnie Baxter entered into a forward contract that required her one year after entering into this loan, this thing that she says, oh, I'm doing this because I want to do a 30-year long-term investment, required her to take almost the exact right amount of liquid dollars, transfer them to HVB, exchange them into almost the exact right amount of euros to pay off her loan in one year. And that's going to be JA 558 paragraphs 194 to 95. I'm also going to point you to the fact that a year later she did that transaction, JA 564 paragraph 222 and supplemental appendix 46. She only owed 826 euros more than what that forward contract required her to exchange. I don't see how you can say you're planning to do a long-term investment, but you have to pull out money and do an exchange of liquid funds one year later. And so what the tax court said is, I don't believe you. I think you looked at this as a one-year thing in order to get this tax loss. And looking at the cost here and looking at how expensive this was, I say that there was really no reasonable expectation of profit here. And she really – one big point here, the one legal point that's really being made here is to claim, hey, you should look at the investments and the loan together, but they're not integrated. You know, they're not, as my opponent said in his opening argument, interdependent steps. Regardless of what they – In a degree, in a transaction like this, you seem to be alluding to the fact that there's a lot of things they could have done. They want to make money. They could have gone and gotten a loan instead of doing some of the things they did. But as the courts look there, I mean, this looks like it could be a really, really bad deal. I think that's what the – I think the tax court found it was a really, really bad deal. It said this is not a structure. She called it – Well, not enough. I mean, just the fact that you make a really, really bad deal. She said the only reason you would have entered into this transaction, structured this way with these heavy costs, with all these one-year terms, with all of these owner's terms attached, is to get the tax benefit. And the fact is this is completely separate from any subsequent investment. It's interesting to me that the sale generated almost the exact amount of the combined fees. It's not only interesting. It was intentional. That was planned. And that was one of the things that the tax court relied on. She said if you really were trying to maximize your long-term investments, why wouldn't you say how much money can I get from you? Instead, the amounts were literally calculated based on the amount of capital gains they wanted to shelter. And she also said, look, if you were really trying to do this for the benefit of your long-term financial health, you would have tried to drive down the cost. You would have talked to somebody else. You would have talked to your normal banks. You would have talked to lots of other people. You're the only one here. They said they did talk to trusted advisors who independently reviewed the transaction and reached a conclusion about it without regard to the Brown and Wood opinion letter. And that the finding to the contrary was clear error. I take it you disagree? Let me take that as two separate things. The first thing is they failed to go to any other banks to look for financing. So that's one point. I do disagree that there was an independent analysis here as to the legality, the propriety of claiming a loss in 2000 on their tax returns. First of all, these advisors really didn't make any independent analysis as to the propriety of this taking this loss. They only looked at the Brown and Wood opinion and some of the materials that were cited. Let's look at Tom Rogers, JA 2623-24. I read several cases. I advised it was a well-reasoned opinion. 2641-42, I advised it was well-reasoned to just go along with it. He basically said, you know, I'm going to go with what the Brown and Wood opinion said. JA 2647, didn't actually investigate the factual underpinnings of this opinion. Let's see, Barbara Coates, JA 2823-24. I read, quote, a number of cases in revenue rulings, but not all. I advised it's a very solid opinion. 11, JA 2910-11. He said he checked some sites. All sites he checked were appropriately cited. There certainly were conflicts of interest with Brown and Wood. You know, and they were obvious ones. You know, if you look at the fact that they didn't, the Baxter, neither Baxter nor Curtis actually found Brown and Wood. It was part of the tax shelter package put together by the Chenery Group. They paid Brown and Wood through Chenery. Not only did Brown and Wood, they were suggested by Chenery, but the Brown and Wood attorney who handled the opinion, R.J. Rubel, was actually a reference for Roy Hahn from Chenery. And so you had these obvious problems that said you can't just rely on the Brown and Wood opinion. Now, there are two points that taxpayers have pointed to to say, hey, these are credibility calls we think are just wrong. And the first one is pretty, the second one is pretty easy to deal with, and that is, well, 9-11 was, we think there's reason, there's documentary evidence to say that 9-11 was the reason that the loans were pulled. The tax court didn't have to believe that. She didn't deny that that was the reason given. She just found that it was a pretext. She found based on all those one-year terms we went over that, in fact, everyone thought this loan was going to be pulled one year later with very little additional cost to the taxpayers. But the second, the first one that they pointed out, she says, well, Barbara Coates said that the taxes were only going to be deferred. I find there's a lack of documentary evidence. And they say, oh, there's this Exhibit 66P, which are notes from Mike Levin, saying there's just going to be long-term tax deferral. And they said this is a huge, big deal. This was independent advice. It's not independent advice about the legality of claiming that loss in 2000. It has nothing to do with what you put in your 2000 tax return. It's a question of partnership accounting dealing with the basis for different partner shares. And it actually has nothing to do with the Lonnie Baxter individual card shelter because this goes, it went solely to the question of whether the taxes owed through the Curtis partnership were going to be eliminated or deferred. I'm not necessarily certain that this advice is correct. Partnership basis issues are messy. But what we really have here is this question. Did they do an independent analysis of whether it was appropriate for the Baxter's or Curtis to claim a massive loss, far in excess of the money they put into the scheme on their tax returns? And the answer is no. And all of those answers really rely on some very deep credibility calls. We've gone through the objective test, as you said, that, you know, she looked at the analysis. She looked at the analysis that was done by Colby and said, you know, compared to conventional loans of a similarly highly collateralized loan, this was a very expensive loan. It reduced the taxpayer's combined wealth by 2.19 million euros and likely more if it had continued. The fees and collateral requirements were substantially above market rates. You know, even their own experts of Allero on JA3017-18 said they paid $2.3 million to get 2.25 million in investable funds. Surely they could have gotten $2.25 million to invest in the exact same investments from somewhere else. And the investments are completely separate, and that point makes clear why. You didn't need to do the investments to do the CARDS transaction. Plenty of CARDS transactions went through without any investments going on at all. Number two, you didn't need to do the investments to claim the loss on the tax return. In fact, the investments had not occurred in 2000, which is when they claimed they had the loss. But number three, you didn't need to use the CARDS transactions to do these investments. You could have used any money. They used money from lots of sources to do the exact same investments. This is the investment asset allocation that they adopted in 1998 before the ABP sale. They then put their money from the ABP sale in it. They then put their money from the CARDS transaction in it. After that one ended in one year, as it inevitably would, they then used money from a CIBC margin loan to keep it up. So what you really have here are investments that are completely separate that they're trying to use to say, hey, this means that we expect a profit and that we subjectively intended for this to be a profit-making entity. And the court just didn't believe them. She says, you know, I don't find your alleged business purpose of having long-term investment funds to be credible. You didn't minimize the borrowing costs or maximize investment funds. That's fully supported by the record, JA 2231 to 32, 2265 to 66, 2318 to 19. The taxpayers knew or should have known this would not last 30 years. We've already gone through all those terms, all those one-year terms, especially, especially, especially, that forward contract that you would never have in something you were planning to use for a 30-year long-term investment plan. And you knew you had substantial tax liabilities. You sought tax shelters from other places. You structured your transaction to offset gains. You rushed your transaction through. You didn't try to go with anybody who was going to give you a better rate or more money for investment without these tax losses, these very fake tax losses. And, again, those are fully supported, JA 2068 to 69, 2010 to 11, 2184 to 85, 2266 to 67. I could just go through. There's just so much support for what the court found here, and none of this is undermined at all on this appeal. And these are findings that need to be respected under this court and the Supreme Court's case law. And this court specifically said in the Hunt case that you can use these sort of objective facts to find that the inferences against the subjective claimed business purpose. Now, as I mentioned, a lot of the tax court's analysis on the objective side relied on Colby. He is well qualified. He was using a sort of standard kind of financial economics analysis to address this. His analysis is consistent with the facts. You know, you have a situation where he says this loan was really much more expensive than was necessary to fund these investments. And you look at what HVB charged as their origination fee, less than 1 percent. That's JA 20 to 29 to 30. And, ultimately, there's a lot of discretion here. What the court did is she had extensive word here. She heard arguments. She made findings at JA 30, 56 to 57, and JA 31, 83 to 86 in the transcript. And then she promised when she made those findings that the testimony was admissible. I'm going to consider the lengthy cross-examination I've just allowed, and I'm going to consider it in determining how much to rely on Colby. This is exactly what the court in the Kerman case, which is another cards case out of the Sixth Circuit, affirmed in letting in the same expert. Speak, if you will, to the penalties, and what is the meaningful differences that you identify here with the Gustafsson case? Well, first of all, there's a lot of financial sophistication here. We have people who had a lot of experience with investments, a lot of experience with loans. Unlike in C&T where you had a funeral home director who was understood, really, just put his money in a bank and didn't do any sort of complex financials. These folks knew at all times that they didn't owe the money they were claiming on that tax return. You look at Lonnie's testimony, JA 27, 52. Well, did you have to pay back $35 million between you and? Oh, no, that's not what we owed at that time. Because she knew how loans worked. She knew that the money was going to first come from that time deposit. So they knew this was too good to be true. The second thing is the court in C&T found that there was independent analysis that was done of the son-of-boss shelter in that case. Whereas here you have the tax court found there was not independent analysis, and I've gone over why we think that's true, and I've given you the sites from Rogers, Coates, and Levy that support her holdings. And the final thing that I would say is you had here a lot of understanding of the fact that the B&W, the Brown and Wood opinion, was tainted. And you have a lot of reliance here by the taxpayers' advisers and by the taxpayers. They've got all these advisers. They even had a private investigator. They've got lawyers all over the place. What could they have done to establish a reasonable cause and good faith here? I'd say a couple things. Number one, the court found that Jay Bird, and through him his mother, Lonnie Baxter, knew that the advisers relied heavily on that Brown and Wood opinion, and they should have insisted you need to do a fresh look at this. You cannot rely on the Brown and Wood opinion. The conflict of interest here is too clear. That Brown and Wood opinion is part of this prepackaged tax shelter, a tax shelter we've been hunting for. And so I need you to do a fresh, complete, independent look, which they didn't do. But the second thing is, unlike in the C&T case, all of these folks testified. In the C&T case, the taxpayer there was too old and too sick to testify, and so they just had sort of some secondhand people who said, he really lacks sophistication. Here are these people testifying. And ultimately what she found was, I just don't believe you. I find you're not credible. I find that you've claimed that you really weren't that motivated by the taxes, and I find that you were. And she pointed to, and we give you all the sites to what she's referencing, where they said, well, I wasn't motivated by the taxes, or I don't know if I would have done this but for the taxes, or I was glad it wasn't only being deferred. And she says, I think you were highly motivated by the taxes. And I think that she looked and said, you knew this was too good to be true. You knew that you were never going to have to pay out these millions of dollars of losses you've claimed on your tax return, and you claimed those losses anyway because you wanted to shelter your capital gains. And that's sort of credibility finding. Okay. It's been going on for 17 years or so. All of a sudden now the tax court want to come in and use cases that came about around 19, 2005, 2006, to judge conduct that already occurred. You know, we cited a number of cases from before 2000, including American Electric Power, Nicole Rose, James Rice's Toyota World Basic, that say you look at the transaction that generated the loss. You don't look at other transactions. And here there's really no basis to say that these separate investments were integrated. They weren't part of the whole undertaking. The whole undertaking was the cards transaction. That's the only thing that led to the loss. And I said there's three reasons why they're separate, and that anybody, especially someone as financially sophisticated as Lonnie Baxter or Jay Berg, can look at it and say, I don't need to do the investments to do this cards transaction. There's nothing in the agreement saying I have to do an investment. Number two, I don't have to do the investments to claim the loss. In fact, I haven't done the investments, and I'm claiming the loss. And number three, hey, I can use any money I want to to make these investments. I don't need to do the cards transactions to do them. It's separate. It's not integrated. It's not part of the whole undertaking. It's separate, separate, separate. Are there any further questions? Did you try the case, too? I did not, no, sir. Did you argue the case in the 11th Circuit? I did, yes, Your Honor. Is there any material difference between the two cases? The only real difference is that that's a partnership and this is an individual. I understand that. And so that does – And that involves more money than this one does. Right. But in terms of – The issues. Not the issues. You've got two courts considering the same issues. That's right. What are the pitfalls of that? I mean – No way you could consolidate it somewhere? No, because the taxpayers have different residencies. I understand that. And so even though they were consolidating the tax – I understand that. There's no way legally that you all could have put it together from the same court. Certainly I couldn't. It was all before the tax court is one case. That's right. Now you've got up here, you've got two appeals, you've got six judges involved in it. What are the pitfalls of that? Well, certainly courts can – What if we make different decisions? This is at least the third set of cases I've done where something similar to this happened, where, you know, you had cases that came that were together in the tax court. You're just the one who can explain it to us then. And in one set of cases, all the courts came out the same way, and when they came out different ways. And it's actually one of the – Maybe we're just lucky then. Well, you could come up with different decisions because they have 11th Circuit law. We've got 4th Circuit law. They do. And there are some differences. There are some differences, although primarily just on the economic substance point. And in this particular case, I don't think it actually matters. Because in the 11th Circuit, they'll find no economic substance if you fail either the objective or subjective test. But because it was consolidated with the 4th Circuit case, the court found – made findings on both objective and subjective for both the 4th and the 11th Circuit cases, so for both Curtis and Baxter. So this isn't a case where she said, okay, for the 11th Circuit, I only had to find objective, so I'm not going to assess subjective for Curtis. So because the court made findings on subjective for both, it seems unlikely that there would be some different conclusions there. But, you know, obviously – You said they're the same case. Same issue. There are no material distinctions. Is that – do you answer that yes or no? I mean, the only – as I said, their partnership – and look, you know, I think – I'm trying to remember. There may be one aspect that has a slightly different standard of review in the 11th Circuit. I would have to look at that. But, you know, they were tried together. I think it should be fully affirmed by both courts. Thank you. Thank you. Mr. Autry. Thank you, sir. Judge King, I think I owe you an additional apology. I'm not sure I answered your question about the difference between the 11th Circuit and the 4th Circuit. Here's the most significant difference. In the 11th Circuit, they're dealing with the partnership motives and those sorts of things. Reasonable cause are judged at the partnership level. Here we're dealing with Lonnie Baxter, who graduated from high school by way of correspondence, no college, who had retired and gone home to take care of her husband, a Vietnam War veteran, who is also subject to these penalties, blind and suffering from PTSD. So their circumstances are different for both the reasonable cause aspects and in terms of reliance for profit motive and what they were told. If you look, the second point I would make, again, I'd invite your attention to Exhibit 4J as to what they were told. I may have missed a point with you, Judge Wynn. There's no dispute. The unequivocal testimony from everybody is a one-year deal made no sense from an investment perspective or a tax perspective. Just a one-year deferral from a tax would be idiotic to pay these amounts for a one-year deferral on the tax side. It would be even more idiotic from an investment perspective. If you look at JA106, which is part of that schedule, that Exhibit 4J, it's the Excel spreadsheet. On the far right-hand column, it's got a column of what is the needed rate of return to make a profit. And it starts out huge because you've got front-end fees. They're amortized over the first four years, again, inconsistent with the idea that it's a one-year deal. And it gets better and better and better and better and better the longer you stay in the deal. And so it's clear that they were looking at a long-term program, even though it absolutely did blow up and didn't work out that way. There was anger. There's testimony about anger associated with that. The other thing that I'd like to comment on just ever so briefly, it's my third point, I never got to, was the idea that Daubert is dead. Daubert is dead unless this court enforces its rule in Cooper v. Smith and Nephew, which basically says that the party has to make a showing, has the burden of proper ponderance of satisfying the reliability elements. Peer review error, acceptable error rate here, 100% error rate, accepted within that school of thought and tested. None of those showings were made, despite the fact that it was demonstrated at trial that the sole treatise upon which this gentleman relied to exclude revenue from determining profit, a mathematically impossible exercise to calculate profit without revenue, that that idea was severely criticized in the one treatise upon which he relied. The final point that I wanted to make is they're presented with this presentation. It offers interest-free. There's all this discussion about, well, they could have gone out and done the same thing elsewhere. No one, but no one, none of the other banks ever talked to about the letter of credit, were offering them an interest-free deal for any period of time, much less an extended period of time. They insist upon it being restructured, that they're not going to do this unless they can invest it through their investment managers. That serves no tax purposes. Solely for investment reasons is this restructured into a capital leverage program on which they can reap a 9.3% return. Their advisors are helping them through the tax and non-tax structure all along. They're renegotiating the contracts. They're coming to different tax conclusions. They're people upon whom they still rely. And to Judge Winn, your point, even by way of hindsight, the banks are saying to themselves, what more could they have done? This is completely different from the gentleman in Gustafshaw who had no local advisors, never talked to anybody from the law firm, who prepared his own returns, had his own tax sophistication. Again, we have a chart of all of the difference between what these people did and that gentleman failed to do that demonstrate that these people did the very best they could. I won't violate the right ones once more. Thanks very much for your kind attention. Thank you very much, sir. We appreciate it. We'll come down and re-counsel and then go to the next case.
judges: Robert B. King, Allyson K. Duncan, James A. Wynn Jr.